AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of South Dakota

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
INFORMATION ASSOCIATED WITH THE FOLLOWING FACEBOOK
USER: USERNAME: RICKY BAGOLA AND FACEBOOK ID:
100038600205762, THAT IS STORED AT PREMISES CONTROLLED
BY FACEBOOK INC.

)
)
)
)
)
)

Case No.  5:20-mj-92

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

SEE "ATTACHMENT A", which is attached to and incorporated in this Application and Affidavit.

located in the _____ District of _____ South Dakota _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE "ATTACHMENT B", which is attached to and incorporated in this Application and Affidavit.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

Code Section                                                   *Offense Description*

18 U.S.C. §§ 1111 and 1153        Second Degree Murder

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI SA Erik K. Doell
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  4-20-2020

_____
*Judge's signature*

City and state:  Rapid City, SD

Daneta Wollmann, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

5:20-mj-92

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH THE
FOLLOWING FACEBOOK USER:
USERNAME: RICKY BAGOLA
AND FACEBOOK ID: 100038600205762
THAT IS STORED AT PREMISES
CONTROLLED BY FACEBOOK INC.

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

State of South Dakota )
) ss
County of Pennington )

I, Erik K. Doell, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI)
currently assigned to the Minneapolis Division – Rapid City Resident Agency. I
have been employed with the FBI since February 17, 2009. I am currently
authorized to investigate matters involving crimes committed within Indian
Country as defined in 18 U.S.C. § 1151, including murder, in violation of 18
U.S.C. § 1111.

2.      I am aware that 18 U.S.C. § 1111 criminalizes murder.

3.      I make this affidavit in support of an application for a search warrant
for information associated with a certain Facebook user ID that is stored at
premises owned, maintained, controlled, or operated by Facebook Inc.
("Facebook"), a social networking company headquartered in Menlo Park,

California.   The information to be searched is described in the following paragraphs and in Attachments A and B.

4.     This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence of violations of 18 U.S.C. §§ 1111, and 1153, second-degree murder, are present in the following Facebook account user: USERNAME: Ricky Bagola and Facebook ID: 100038600205762 (also referred to in this affidavit as Target Account).   There is also probable cause to search the information described in Attachment A for evidence, contraband, or fruits of these crimes, as further described in Attachment B.

6.     The facts set forth in this affidavit are based on my personal knowledge; knowledge obtained from other individuals, including other law enforcement officers; interviews of persons with knowledge; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. This affidavit contains information necessary to support probable cause for this application and does not contain every material fact that I have learned during

2

the course of this investigation; however, no information known to me that would
tend to negate probable cause has been withheld from this affidavit.

## **PROBABLE CAUSE**

7.      On January 3, 2020, your affiant received notification of a homicide
occurring at a residence in Pine Ridge, South Dakota. The victim, Casey Weston,
a/k/a/ Casey Long (Weston), was residing at the residence with his girlfriend,
Kehala Thomas, and Michael Lebeau. The shooting occurred at approximately
12:35 a.m. Kehala Thomas, Michael Lebeau, Kayla Eagle Bull, Benjamin Lyndon
Bacon-Wilson and Stan Garnier Jr. were also present in the home at the time of
the homicide.

8.      At 12:36 a.m. Oglala Sioux Tribe Department of Public Safety
(OSTDPS) dispatch received the first call regarding the shooting. OSTDPS law
enforcement officers responded to the scene and found the victim inside the
home. A female, later identified as Kehala Thomas, was holding Weston. Weston
was shot through the closed front door of the house. Multiple bullet holes were
observed on the front door. Weston was located on the left side of the door
(looking inside the trailer from the front porch). Law enforcement observed
several pools of blood near Weston. Several shell casings were collected from
outside of the home by law enforcement.

9.      It was determined that Weston died prior to law enforcement's
arrival. OSTDPS law enforcement officers removed the witnesses from the trailer.
The FBI executed a search warrant of the trailer. At the conclusion of the search,

3

the coroner removed Weston's body and an autopsy was subsequently performed. The autopsy revealed the cause of death was a single gunshot wound which penetrated one of Weston's lungs and aorta.

10.    Stan Garnier Jr. was present at the residence prior to and during the shooting on January 3, 2020. Garnier told your affiant that Keshia Hayes and Dani Jo Brown arrived at the residence in Hayes' green Chevrolet pickup. According to Garnier, there were two other individuals in the vehicle. Garnier did not know who the individuals were, but stated that Sage Black Feather told him that the individuals in the pickup were Benjamin Freeman and Scud Martin, a/k/a Dale Martin Junior. Garnier told your affiant that Hayes and Brown were looking for Lebeau. Garnier told your affiant that Lebeau was not present at the trailer, although other witnesses contradict this. According to Garnier, Hayes and Brown spoke with Weston. Garnier told your affiant that Hayes and Brown said that Lebeau owed them money and that the girls thought that they, meaning the residents of the trailer, were hiding Lebeau. Garnier told your affiant that the girls left the house and that someone got out of the truck and started banging on the door. Garnier told your affiant that whoever it was banged on the front and the back doors. Garnier went to the back of the trailer and Weston went to "peek" out of the front window. Garnier heard a loud popping sound. Garnier dropped to the floor, crawled and got near the washer and then jumped up. Garnier saw Weston stand up and subsequently fall to the floor. Garnier described the residents of the trailer screaming and that Lyndon Wilson, a/k/a

4

Benjamin Lyndon Bacon Wilson (Wilson), took off.  Garnier described Keisha
Hayes and Dani Jo Brown leaving, hearing pounding on the trailer, and the
shooting taking place one right after the other.  In other words, your affiant
believes that Garnier was conveying to your affiant that the shooting occurred
immediately after the girls left and hearing banging on the trailer doors.

11.   Your affiant interviewed Wilson.  Wilson told your affiant shortly
before the shooting that Hayes and Brown came to the trailer looking for Lebeau
to collect money.  Wilson said that Lebeau stood near the kitchen sink and was
arguing with the girls.  Wilson said that the girls left and that he subsequently
heard what he described as "tapping" on the window.  Wilson stated that Weston
went to the window and that he heard shots being fired.  Wilson described
hearing what he thought sounded like 13-14 rounds being shot at the trailer.
Wilson stated that Lebeau has a gun, and that he did not know Hayes or Brown
by name.  Based on multiple interviews, your affiant concluded that Wilson was
referring to Hayes and Brown as the girls that came to the trailer to collect money
from Lebeau.  Immediately after the shooting, Wilson told your affiant that he
(Wilson) took off to his uncle's residence and then to his brother's residence.

12.   Although several witnesses denied that Lebeau was at the house at
the time, Lebeau confirmed in a text message to your affiant that he was in the
house at the time of the argument and the shooting.  Hayes and Brown also
confirmed Lebeau was present in the house for the argument.

5

13.     Your affiant interviewed Weston's girlfriend, Kehala Thomas, a/k/a Kehala Chief Eagle (Thomas).  Thomas advised that Weston was playing a video game at the time she heard what she described as "pounding" on the window. After hearing the pounding on the door, Thomas heard three pops and Weston yelled "what the fuck!"  Thomas also heard a male state, "open the fucking door." Thomas held Weston on the floor until law enforcement arrived.

14.     Your affiant also interviewed Kayla Eagle Bull.  Eagle Bull did not mention Lebeau being at the trailer.  Eagle Bull advised your affiant that just prior to the shooting, Weston had been playing a video game.  Eagle Bull described hearing "banging" on the door and that someone went to the truck and came back and that she believed that someone was banging on the trailer with a bat.  Eagle Bull described hearing three rounds discharged at the trailer.  Eagle Bull said that when she heard knocking on the door the first time, Weston said not to answer the door.  Eagle Bull said that when Weston "peeked" around the door, presumably to see who was banging on the trailer, that was when he was shot.

15.     Your affiant interviewed Brown.  Brown advised that she went over to Lebeau's house to smoke cigarettes around 9:30-10:00 p.m. on January 2, 2020.  She asked Lebeau about money he owed Hayes for drugs and he told Brown that Hayes needed to get it herself.  Brown left and went back to Hayes' house.  Brown said she believed Lebeau "ripped off" Hayes of $50 and they went back to Lebeau's trailer shortly before the shooting to collect the money.  Brown

6

later admitted that she had set up the drug deal between Lebeau and Hayes. Brown initially lied and said it was just she and Hayes who went back to Lebeau's later that night, but later in the interview she apologized for lying and said Ricky Bagola also went with them. She said that she and Hayes went into the house and Weston opened the door for them. She claimed that Lebeau started hollering at them and then she and Hayes left. According to Brown, she and Hayes returned to the pickup and told Bagola that Lebeau yelled at them. Brown claimed Bagola got out of the pickup, approached the trailer and knocked on the door, then returned to the pickup. They then left. She said Bagola tried to call Lebeau via Facebook, but was unsuccessful. She claimed the truck had bald tires and they got stuck near Lebeau's house so they had to drive in reverse away from the residence. Brown claimed that Lebeau probably shot up his own trailer and that Weston was Lebeau's "doorman." Brown also stated that Weston was fine when they left and that Lebeau was mizzing out (a colloquial term often used to describe someone reacting negatively to a situation).

16.     Your affiant also interviewed Hayes. Hayes told your affiant that on January 2, 2020, Brown said she could "score" methamphetamine. Hayes gave Brown $100. Brown left and then later returned to Hayes' residence with the drugs. Hayes said Brown had been "shorted" $40 worth of methamphetamine. Brown messaged Lebeau about the issue and Lebeau said Hayes would have to go to his house and get her money back. She believed they went back around midnight. Hayes drove herself, her boyfriend-Ricky Bagola, and Brown to

7

Lebeau's trailer.  Hayes said she and Brown went to Lebeau's door, knocked and were let inside by Weston.  She said there were others in the house in various locations.  Hayes described Lebeau by the sink, a guy at the table, a guy at a table across from the couch and Weston by the door.  Hayes claimed she and Brown stood at the door and Lebeau yelled at them.  According to Hayes, Lebeau stated, "you probably pinched [it]," referring to a dispute/shortage in methamphetamine.  According to Hayes, she looked at Brown and stated "Alright then."  They went to leave and Weston opened the door for them.  They went to the truck and in response to Bagola asking them what happened, the girls told Bagola that Lebeau had cursed at them.  Hayes then reported Bagola got out of the pickup and said, "Well, I'll try to get the money back" and approached the house and pounded on the door.  Hayes claimed that after knocking on the door, Bagola did not enter the house.  Rather he returned to the pickup and they left, and went back to her residence and "got drunk."  Hayes claimed not to have heard shots and denied owning a gun.  She also did not think Bagola had a gun.  She saw people "strolling" at the time but did not take notice of who they were.  Hayes said they collectively decided to just "take a loss" on the money Lebeau owed them.

17.     Hayes' and Brown's version of the events do not comport with video footage of the area your affiant obtained from a nearby bank.  Per employees of the bank, their cameras were not corrected to account for the bi-yearly daylight savings change so they show times one hour ahead of the actual time.  In

8

addition, when your affiant compared Oglala Sioux Tribe Department of Public Safety dispatch times to camera times, it appears that the camera time is approximately 3 minutes ahead of dispatch time. Your affiant believes dispatch time(s) to be the more accurate time. Based on that, your affiant corrected bank times in this affidavit to account for being an hour and three minutes ahead of dispatch.

18.     On the bank's video, your affiant observed Hayes' pickup arrive at Weston's residence at 12:34 a.m. At 12:38 a.m. the pickup starts up because the lights are illuminated. At 12:39 a.m. the pickup drives back by the camera. At 12:40 a.m. one of the first calls to law enforcement was made. Garnier called the Adult Offender Facility and reporting the shooting. An employee at the Adult Offender Facility subsequently called into OSTDPS dispatch to report the shooting. The timing is consistent with an occupant of the pickup shooting into the front door of the house and then fleeing the scene.

19.     Your affiant interviewed Ricky Bagola during the search of Hayes' residence, prior to interviewing Brown and Hayes. Therefore, your affiant was not aware that Bagola was present at the homicide scene and a subject of the investigation.     However, it is important to note that Bagola provided misinformation to your affiant regarding the presence of his phone. During your affiant's interview with Bagola, he denied being in possession of a cell phone. However, Bagola's cell phone was found inside Keisha Hayes' residence during the execution of a search warrant. At that time there was not probable cause to

9

search and/or seize his phone, so it was not collected.  Bagola did confirm that he had been dating Hayes for about 1 month and that they were boyfriend and girlfriend.

20.    On March 9, 2020, your affiant conducted a follow up interview with Brown.  Brown corroborated information she previously provided.  Brown also provided new information.  Brown told your affiant when she and Hayes got back in the pickup, they told Bagola that Lebeau refused to give them the money he owed them and cursed them out.  Bagola became upset when he heard that Lebeau would not compensate the girls for being shortchanged.  Bagola reached down into the passenger side footwell and recovered a firearm, described by Brown to be "long."  Bagola exited the front passenger side of the pickup and approached the front of the trailer.  Brown stated that Bagola pounded on the front door.  Brown told Hayes to stop Bagola and that Bagola was drunk.  After receiving a negative response from the occupants of the trailer, Bagola pointed a gun at the front door of the residence and discharged it.  After firing the shots, Bagola got back in the pickup.  Bagola told Hayes to "Go," Hayes appeared to be stunned, and Bagola stated words to the effect of "fucking go."  Hayes drove and they traveled to Bagola's father's house and then returned to Hayes' house.  Brown described the gun Bagola had as possibly being a .22 caliber firearm.

21.    In April 2020, your affiant received the search warrant return for Brown's Facebook Account.  Your affiant observed several messages between Brown and the Target Account.

22.    On January 5, 2020, at 07:54:48 UTC (around 12:58:48 AM on January 5, 2020 time conversion conducted via timeanddate.com) the following conversation between Brown and Target Account took place:

> Brown: You know we love you.. here for you in any way we can be. Don't so this to eesh[1] please...
>
> Target Account: Im not i live both u n wats cummn is only death
> Sent:  1-5-2020 at 7:57:25 UTC
>
> Target Account:  I got love for your cuz[2] danni n only the best for her were im goin it only takes u a dark side i told both u im a ryda n I'll die for mines i proved it already my head is all over da place.
> Sent:  1-5-2020 at 8:03:44 UTC
>
> Brown:  Well didn't have to just leave...
> Sent:  1-5-2020 at 8:05:00 UTC
>
> Target Account:  Sorry to both u my corner got small
> Sent:  1-5-2020 at 8:05:50 UTC

Your affiant believes that on the morning of January 5, 2020, Hayes, Brown and Bagola were together and that Bagola left. Brown subsequently contacted Bagola and expressed to him that she and Hayes cared for Bagola. Your affiant believes that Bagola expressed to Brown that he cared for both she and Hayes and that he knew his fate was death, presumably as punishment for killing Weston. Bagola then wrote he was a "ryda,[3]" and that he would die for his [friends].

---

[1] Reference to Keisha Hayes.

[2] Your affiant believes Target Account is referring to Brown's cousin – who is Keisha Hayes.

[3] Your affiant believes this is a colloquial term that references a close friend who is willing to do almost anything for another friend.

23.    On January 5, 2020, at 8:27:16 UTC, Target Account sent Brown a screen shot of a Facebook post.  The relevant portion of the screenshot is a comment written by Mike Lebeau.[4]  Lebeau wrote:

> Going to miss you n your attitude that made yoy (sic) you ... one of a kind always down to get down always respected when respect was presented. Goung (sic) to miss you bro n know Keisha Hayess n Danny Jo are the ones who caused baby bear to be rraised (sic) without a father so pray to you above brother to know your boy well (sic) grow to know who is farhg (sic)[.]

Brown responded: Smh (shaking my head).

24.    Approximately 30 minutes later, Bagola sent two screenshots of a redacted text message or Facebook Message to Brown.  Your affiant believes that if this was a Facebook Message, a search of the Target Account would reveal who sent this message to Bagola.  The screenshot was redacted so that whoever sent/received the message(s) could not be determined.   The message is as follows:

> Unknown sender:  Rick doesn't come over anymore...And I really never seen her truck only from a distance
>
> Redacted recipient:  When i was in line getting food.....i over heard these two ladies talking about it but they didn't say the name of the guy who died
> Redacted recipient:  All i heard was that it was all over meth
> Redacted recipient:  Being shorted on meth n that casey guy answered the door n they shit him
> Redacted recipient:  shot
>
> Unknown sender:  Holy F***.  I didn't know Casey was on meth
> *Bagola sent the continued screen shot*

---

[4] Facebook account is Mike L Leheaux.

Redacted recipient:  U known how u can tell if that's her truck it has stickers of bullet holes
Redacted recipient:  I seriously think that is her truck

Unknown sender:  Wow maybe it is... Holy shit really wanna know what happened now

Target Account then sent Brown this message: "I got u dan ur part b (sic) my crew dont (sic) worry bout it[.]"

25.    On or about April 14, 2020, Bagola was arrested in Pine Ridge by the OST DPS.  Your affiant interviewed Bagola that same day.  Bagola did not admit to killing Weston, but did admit to being in the vehicle with Hayes and Brown the morning Weston was murdered.

26.    Your affiant believes there is probable cause to search the Target Account for evidence of the crime of second-degree murder based on the conversations your affiant observed between Brown and Target Account.  Target Account made implied references of punishment when he referenced "wats (sic) cummin (sic) is only death" and that he was a "ryda" and "proved it."  See paragraph 22.  Additionally, your affiant believes that a search of the Target Account could reveal the identity of the person(s) who sent and received the screen shots in paragraph 24 above.  Finally, your affiant is aware that Brown advised Bagola tried to call Lebeau via Facebook on the morning of the homicide.  See Paragraph 15.  A search of the Target Account's Facebook would render further corroborative evidence of the crime of second-degree murder, in violation of 18 U.S.C. §§ 1111 and 1153.

27.     Your affiant is aware that Bagola is an enrolled member of the Oglala Sioux Tribe and that the location of where the homicide occurred, Pine Ridge, SD, is within the exterior boundaries of the Pine Ridge Reservation.

28.     It should be noted, that your affiant's investigation has rendered information from various witnesses which is inconsistent.  Your affiant has set forth that information in other search warrant affidavits related to this homicide. The information set forth in this affidavit is used to establish probable cause for the issuance of an arrest warrant for Ricky Bagola.  Nothing in this warrant is meant to give the court the impression that any particular witness's claims are the true and correct version of the events, but are the facts various witnesses provided to your affiant, relevant to establish probable cause for an arrest warrant.  As your affiant's investigation has continued, it has evolved, and the facts and suspects have changed.  All facts set forth in this affidavit and other affidavits are based on the information your affiant had at the time of the affidavit and changes are not based on your affiant's inconsistencies, but based on the information provided to your affiant by witnesses.

## INFORMATION ON FACEBOOK

29.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows individuals to specifically communicate with another person through a Facebook application called "Messenger."  In my training and experience, people who engage in online criminal activity often also utilize Facebook to meet victims

and other offenders and to chat.  Even if Facebook was not utilized in the chat at issue, there is probable cause to believe there will be evidence regarding murder within the target Facebook account.

30.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

31.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

32.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's

account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

33.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

34.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can

post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

35.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

36.    Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

17

37.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

38.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

39.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but people who visit the user's Facebook page cannot viewed it.

40.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

41.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook

users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

42.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

43.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.   When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.  Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information;  News  Feed  information;  status  updates;  links  to  videos, photographs,  articles,  and  other  items;  Notes;  Wall  postings;  friend  lists, including  the  friends'  Facebook  user  identification  numbers;  groups  and networks of which the user is a member, including the groups' Facebook group identification  numbers;  future  and  past  event  postings;  rejected  "Friend" requests;  comments;  gifts;  pokes;  tags;  and  information  about  the  user's  access and use of Facebook applications.

44.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of

19

action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

45.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

46.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook

20

account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the user accessed or used the account. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining, the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g.,

deleting account information in an effort to conceal evidence from law enforcement).

47.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED
## AND THINGS TO BE SEIZED

48.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## REQUEST/JUSTIFICATION FOR
## ORDER OF NONDISCLOSURE

49.    The United States respectfully applies for an order of nondisclosure to Facebook under 18 U.S.C. § 2705(b) regarding the following account user: Ricky Bagola and Facebook ID: 100038600205762 (also referred to in this affidavit as Target Account).  The United States is seeking this search warrant for user information, including all names, addresses, IP addresses, including

historical, telephone numbers, other email addresses, information on length and types of services and any means of payment related to these accounts under the authority given by 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A).  Based on § 2703(c)(3), the United States is not required to provide notice to the subscriber.  Under § 2705(b), the United States may apply to the court for an order commanding Facebook not to notify the subscriber of the existence of the search warrant.  The court may decide what length of time shall apply to the order of nondisclosure if the court determines the notification to the subscriber could result in one of the five factors listed in the statute, which includes destruction of or tampering with evidence.  18 U.S.C. § 2705(b)(3).  The basis for the request is that such disclosure could cause any person with access to the accounts, or any related account or account information, to tamper with or modify the content or account information and thereby destroy or tamper with evidence and otherwise seriously jeopardize the investigation.  Especially due to the ease of access to Facebook, its content can be modified by persons with internet access and sufficient account information.  As such, the United States respectfully requests this Court enter an order commanding Facebook not to notify the user of the existence of this warrant.

### REQUEST FOR SEALING

50.    I further request that the Court order that the matter be sealed until further order of the Court.   The matter is an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly,

there is good cause to seal the matter because premature disclosure may seriously jeopardize the ongoing investigation.

## LIMIT ON SCOPE OF SEARCH

51. I submit that if during the search, agents find evidence of crimes not set forth in this affidavit, another agent or I will seek a separate warrant.

## CONCLUSION

52. Based on the forgoing, I request that the Court issue the proposed search warrant.

53. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).

54. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Special Agent Erik Doell
Federal Bureau of Investigation

SUBSCRIBED and SWORN to
_____ in my presence
__X__ by reliable electronic means

this __20th__ day of April, 2020.

DANETA WOLLMANN
U.S. MAGISTRATE JUDGE

24

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with the following Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California:

- Ricky Bagola and Facebook ID: 100038600205762.

## **ATTACHMENT B**

### **Particular Things to be Seized**

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f).  Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

All contact and personal identifying information for Facebook user with Ricky Bagola and Facebook ID: 100038600205762 (also referred to in this affidavit as Target Account).

(a)     Including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the accounts and all other documents showing the user's posts and other Facebook activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the accounts;

(h)     All records of the accounts' usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the accounts are or were a "fan" of;

(j)     All past and present lists of friends created by the accounts;

(k)     All records of Facebook searches performed by the accounts;

(l)     All information about the users' access and use of Facebook Marketplace;

2

(m)    The types of service utilized by the user;

(n)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the accounts;

(p)    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook accounts, including contacts with support services and records of actions taken.

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1111 and 1153, second-degree murder, from **December 1, 2019, to present**, including, for the Facebook user identified on Attachment A.

**III.    Information Regarding Search Warrant Compliance by Facebook:**

Facebook shall disclose responsive data, if any, by sending to:

> Special Agent Erik Doell
> Federal Bureau of Investigation
> ekdoell@fbi.gov
> 3600 Jet Drive
> Rapid City, SD 57703
> (605) 872-4119

3

Facebook shall use the United States Postal Service, another courier service or to disclose the responsive data or shall make it available on its law enforcement portal.

(Please fill out this form and return it with your subpoenaed records  It may avoid the necessity of someone from your office having to appear at trial and testify as to the authenticity of the records.  Thank you)

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by

_____,

hereinafter PROVIDER), and my title is _____.

I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of (generally describe records, i.e., number of pages/CDs/megabytes) _____

_____.

I further state that:

a.       all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.       such records were generated by PROVIDER'S electronic process or system that produces an accurate result, to wit:

1.       the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.       the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                            Signature

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of South Dakota

| | |
|---|---|
| In the Matter of the Search of <br> *(Briefly describe the property to be searched <br> or identify the person by name and address)* <br> INFORMATION ASSOCIATED WITH THE FOLLOWING <br> FACEBOOK USER: USERNAME: RICKY BAGOLA AND <br> FACEBOOK ID: 100038600205762, THAT IS STORED AT <br> PREMISES CONTROLLED BY FACEBOOK INC. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     Case No.   5:20-mj-92 |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ District of _____ South Dakota
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A, attached hereto and incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Evidence of a crime of Second Degree Murder, in violation of 18 U.S.C. §§ 1111 and 1153, as described in
ATTACHMENTS A and B, attached hereto and incorporated by reference.

I find that the affidavit, or any recorded testimony, establishes probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before *May 4, 2020* _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____ Daneta Wollmann _____ .
                                                                    *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   4-20-2020 @ 2:00 PM          *Daneta Wollmann*
                                                     *Judge's signature*

City and state:     Rapid City, SD                   Daneta Wollmann, U.S. Magistrate Judge
                                                     *Printed name and title*

cc: AUSA Poppen and Agent

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>5:20-mj-92 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*